IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, INC., RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-md-3071<br>MDL No. 3071<br><br>This Document Relates to:<br>3:23-cv-00742<br>3:23-cv-00979 |

**DEFENDANT APARTMENT INCOME REIT CORP.'S ("AIR")
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS RENEWED MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................................. ii

INTRODUCTION ............................................................................................................................... 1

BACKGROUND .................................................................................................................................. 2

I.      Plaintiffs' Alleged Conspiracy............................................................................................... 2

II.     Summary of Plaintiffs' Allegations against AIR .................................................................. 3

LEGAL STANDARD........................................................................................................................... 4

ARGUMENT ........................................................................................................................................ 5

I.      Plaintiffs' Withdrawal of Allegations that AIR Agreed to Share Confidential Information with Competitors Requires Dismissal of Their Claims Against AIR ............. 5

II.     Plaintiffs Do Not Otherwise State a Plausible Claim Against AIR Through Their Broad, Unsupported Allegations Applicable to All RealPage Customers .......................... 7

        A.     Plaintiffs Do Not Plausibly Allege that AIR Engaged in Parallel Conduct ............ 7

        B.     The SAC's Allegations of "Plus Factors" Do Not Raise Plausible Grounds for Inferring that AIR Joined the Alleged Conspiracy........................................... 8

CONCLUSION................................................................................................................................... 10

## TABLE OF AUTHORITIES

**CASES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 4, 9

*Erie Cnty. v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ......................................................................................... 10

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
    48 F.4th 656 (6th Cir. 2022) ......................................................................................... 5, 9

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................................ 10

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................................................................ 4

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ......................................................................... 8, 10

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ............................................................................ 4, 5, 9, 10

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
    458 F. Supp. 2d 474 (E.D. Mich. 2006) .......................................................................... 5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ........................................................................................................ 5

# INTRODUCTION

Plaintiffs' withdrawal of allegations against AIR confirms that AIR is differently situated than the other Defendants, and Plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC") (ECF 530) should be dismissed as to AIR. In denying the joint motion to dismiss, this Court found "most persuasive" Plaintiffs' core allegation that each Property Defendant[1] allegedly agreed to provide RealPage its confidential, proprietary information for use in recommending prices for AIR's competitors through RealPage's Revenue Management Software ("RMS"). But that crucial allegation does not apply to AIR, and has been withdrawn as to AIR—requiring AIR's dismissal pursuant to the Court's reasoning and determinations in its motion to dismiss orders.[2] Without the confidential information-sharing allegation, Plaintiffs are left to rely on sweeping, unsupported inferences based solely on AIR's prior limited use of a RealPage RMS. That means AIR allegedly did even less than the many other RealPage customers that are not alleged to have joined the conspiracy.

The SAC's few remaining allegations <u>pertaining to AIR</u> do not come close to supporting antitrust conspiracy claims against AIR. Aside from conclusory assertions, Plaintiffs' allegations about AIR are only that: AIR contracted with RealPage to use its RMS; the rents AIR charged tenants for one-bedroom units in certain regional markets were generally consistent with its competitors' prices; and AIR attended unspecified trade industry events. As made clear by the Court's motion to dismiss orders, these thin allegations, standing alone (and unbolstered by the information-sharing allegation), are legally insufficient to state a plausible conspiracy claim against AIR.

---

[1] "Property Defendants" includes the Owner, Owner-Operator, and Managing Defendants.

[2] *See* Pls.' Unopposed Mot. to Withdraw Allegations in the Multifamily Pls.' Second Am. Consol. Class Action Compl. as to Def. AIR Communities, ECF 680 ("Mot. to Withdraw").

1

# BACKGROUND

I.      **Plaintiffs' Alleged Conspiracy**

Plaintiffs allege a nationwide conspiracy based on Property Defendants' use of RealPage's RMS, claiming that such use was accompanied by their alleged agreement to provide their own confidential data to RealPage for the purpose of recommending prices for their competitors:

> 5.      Use of RealPage's RMS was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool. That was the bargain on offer—to access this price-setting tool that promised revenue growth even in a down market, every member (including the Owners, Owner-Operators, and Managing Defendants) agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS. . . .
>
> 6.      By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendant[] agreed with the overarching principles of the cartel: that (1) all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations [an allegation now withdrawn as to AIR]; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation was essential to the successful operation of the scheme, all members would abide by RealPage's price and supply decisions generated by RMS.

(SAC ¶¶ 5−6.)

Plaintiffs also uniformly allege, without any specificity, that each Property Defendant "agreed to join the cartel" by contracting with RealPage. (SAC ¶¶ 68−193.) Plaintiffs theorize that each Property Defendant supposedly knew that by doing so, it would be required "to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to" allow RealPage to generate price recommendations for both AIR and its competitors— <u>an allegation Plaintiffs have withdrawn as to AIR</u>. (*Id.*; Mot. to Withdraw 1−2.) Plaintiffs further allege that each Property Defendant would not have contracted with RealPage "unless" it knew that doing so would allow "it to set prices above a competitive level" and that "its competitors" were also "using RealPage to set their rental prices." (SAC ¶¶ 68−193.)

Despite those allegations, buried in the SAC are concessions that certain entities can and

2

do use RealPage's RMS in a manner inconsistent with the alleged conspiracy set forth in paragraphs 5 and 6. Plaintiffs acknowledge that entities (like AIR) may contract with RealPage and use its RMS without agreeing to share non-public information. (SAC ¶¶ 219−20 (alleging that AvalonBay precluded RealPage from sharing its proprietary data).) Plaintiffs also recognize that entities may use RealPage's RMS without involving a RealPage Pricing Advisor or regular acceptance of RealPage's pricing recommendations and, thus, without "delegating" its pricing decisions to RealPage. (*See id.* ¶ 286 (recognizing an entity may have "a low acceptance rate of RealPage's pricing recommendations"); *id.* ¶ 17 (alleging that "Pricing Advisors are used for approximately 60% of all units using RealPage's RMS").)

## II.     Summary of Plaintiffs' Allegations against AIR

Plaintiffs have withdrawn their key allegation, set forth in paragraph 68 of the SAC, that AIR agreed to share its confidential information with competitors through RealPage's RMS:

> During the Conspiracy Period, Defendant AIR entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 25,000 multifamily rental units nationwide, ~~knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn,~~ to allow AIR to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices. ~~By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices,~~ AIR agreed to join a cartel with those horizontal competitors. . . .

(Mot. to Withdraw 1−2.) To the extent other allegations suggest AIR agreed to share non-public information with its competitors by using RealPage's RMS, Plaintiffs also have withdrawn those allegations as to AIR. (*Id.* at 2 (citing, *e.g.*, SAC ¶¶ 5, 6, 13, 227, 247, 287, 291, 367, 380, 392).)

The SAC contains few remaining factual allegations specifically concerning AIR. Aside from identifying the location of AIR's headquarters and the regional "submarkets" in which it operates (SAC ¶ 67), Plaintiffs allege the following about AIR:

- AIR contracted with RealPage to use YieldStar for "some or all of its more than 25,000 multifamily rental units nationwide." (SAC ¶ 68.)

- AIR would not have contracted with RealPage "unless" use of RealPage's RMS "enabled it to set prices above a competitive level" and "it knew its competitors were, likewise, using RealPage RMS to set their rental prices." (*Id.*; *see also id.* ¶¶ 68−193.)

- The average price of AIR's units in certain regional submarkets during the conspiracy period is consistent with that of other Defendants, purportedly showing "coordinated price increases" by Defendants in these regions. (*Id.* ¶¶ 337−49.)

- AIR attended unspecified events hosted by the National Multifamily Housing Council, an industry trade association. (*Id.* ¶ 386.)

The SAC contains no other material allegations about AIR, specifically.

## **LEGAL STANDARD**

To survive a motion to dismiss, Plaintiffs must plead more than "labels and conclusions" but, instead, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555−56, 570 (2007). Because Section 1 prohibits only agreements that unreasonably restrain trade, not unilateral conduct, "stating [a Section 1] claim requires . . . enough factual matter" to raise "plausible grounds to infer an agreement." *Id.* at 556; *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902−03 (6th Cir. 2009).

Plausibility in Section 1 cases is "evaluated with reference to well-settled antitrust jurisprudence that limits the range of permissible inferences from ambiguous evidence," like parallel conduct. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir. 2010) (internal quotation marks omitted). In this regard, as the Sixth Circuit recognized, "[t]he *Twombly* decision provides an additional safeguard against the risk of 'false inferences from identical behavior' at an earlier stage of the trial sequence—the pleading stage." *Travel Agent*, 583 F.3d at 904 (quoting *Twombly*, 550 U.S. at 554). "If, in the circumstances alleged," the defendants' alleged conduct "'could just as well be independent action,' then the complaint has failed to plead a § 1 claim" against that defendant. *Ins. Brokerage*, 618 F.3d at 362 (quoting *Twombly*, 550 U.S. at

557); *accord Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 664 (6th Cir. 2022) ("[T]he facts alleged must plausibly suggest, 'rather than be merely consistent with,' an agreement to restrain trade . . . ."). Thus, to state a Section 1 claim, Plaintiffs must plead enough facts to suggest the defendants had a "conscious commitment" to an unlawful agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

This well-established standard applies equally to individual defendants, meaning Plaintiffs must plead enough facts to plausibly suggest that a <u>particular defendant</u> joined the alleged conspiracy. *See Travel Agent*, 583 F.3d at 905−06 (affirming dismissal of conspiracy claims against certain defendants when the complaint lacked factual allegations "specify[ing] how these defendants are involved in the alleged conspiracy"). "Plaintiffs cannot escape [this] burden . . . by using the term 'defendants' to apply to numerous parties without any specific allegations as to any individual . . . defendant." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 485 (E.D. Mich. 2006) (dismissing antitrust conspiracy claims); *accord Travel Agent*, 583 F.3d at 905 ("[P]laintiffs' reliance on these indeterminate assertions [regarding "defendants" or "defendants' executives"] is misplaced because they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*."). If a complaint fails to sufficiently allege that a particular defendant joined the alleged conspiracy, then the claim must be dismissed as to that defendant. *See, e.g.*, *Travel Agent*, 583 F.3d at 904−06.

## ARGUMENT

I. **Plaintiffs' Withdrawal of Allegations that AIR Agreed to Share Confidential Information with Competitors Requires Dismissal of Their Claims Against AIR**

Plaintiffs' Motion to Withdraw reflects their acknowledgement that AIR did <u>not</u> agree to share its proprietary information for the purpose of allowing RealPage's RMS to generate price recommendations for its competitors. That concession, and the withdrawal of the core allegation

5

against AIR, precludes Plaintiffs from raising plausible grounds to infer AIR's agreement to, and participation in, the price-fixing conspiracy that they allege.

Property Defendants' alleged contribution of sensitive information to a common data pool, with the understanding that the data would be used by RealPage to recommend prices for their competitors, is the central component of the alleged conspiracy. That, according to the SAC, is how each Property Defendant—except AIR—supposedly joined the alleged conspiracy, i.e., "[b]y agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices" using that information. (*See id.* ¶¶ 68−193 (emphasis added).) According to Plaintiffs, using RealPage's RMS was "conditioned on" the contribution of data, thus supporting Plaintiffs' theory that each Property Defendant "agreed with the overarching principles of the cartel" simply by using RealPage's RMS. (SAC ¶¶ 5−6.) That purported quid pro quo is the fundamental core of the alleged conspiracy. (*See id.* ¶¶ 5−6, 68−193; *see also* Mem. Op. 4, ECF 690 "Mem. Op.".)

The now-withdrawn allegation also is critical to Plaintiffs' ability to state a plausible conspiracy claim, as it is the primary basis on which Plaintiffs attempt to raise an inference of concerted action. Plaintiffs argue Property Defendants' alleged contribution of data for use in recommending prices for their competitors bespeaks of concerted action because that conduct would be against each Property Defendant's economic self-interest if undertaken unilaterally. (Dec. 11, 2023 Hr'g Tr. 34:6–11, ECF 673 ("I mean . . . you wouldn't provide your competitor your pricing data, you know, and everything you were doing for a particular unit if you didn't have an agreement."); *id.* at 37:15–17 ("Well, first of all, the sharing of your private information would dispel that it's independent action."); SAC ¶¶ 291, 380.) The Court agreed, finding this allegation offered the "most persuasive" basis for inferring the existence of a horizontal agreement:

6

> Viewing all of the alleged circumstantial evidence holistically, including the parallel conduct discussed earlier, the Court finds that the Multifamily Complaint's <u>most persuasive</u> evidence of horizontal agreement is the simple undisputed fact that each RMS Client Defendant [except AIR] provided RealPage its proprietary commercial data, knowing that RealPage would require the same from its horizontal competitors and use all of that data to recommend rental prices to its competitors. . . . <u>[T]he contribution of sensitive pricing and supply data for use by RealPage to recommend prices for competitor units is in Defendants' economic self-interest if and only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units</u>.

(Mem. Op. 31 (emphasis added); *see also id.* 20 & n.10.)

That conclusion does not apply to AIR. Plaintiffs have <u>withdrawn</u> their core allegation that AIR agreed to share its confidential data with its competitors, or that AIR "agreed to join" the alleged conspiracy by doing so. Simply put, Plaintiffs allege no facts raising a plausible inference that AIR "accepted the invitation" or otherwise agreed to the "common scheme" alleged in the SAC—one predicated on sharing confidential data to generate pricing recommendations for horizontal competitors. That alone requires dismissal of Plaintiffs' claims against AIR.

## II.     Plaintiffs Do Not Otherwise State a Plausible Claim Against AIR Through Their Broad, Unsupported Allegations Applicable to All RealPage Customers

Plaintiffs' remaining allegations about AIR do not raise plausible grounds for inferring that AIR agreed to join the alleged conspiracy, even when considered against the backdrop of the entire complaint. Setting aside the withdrawn allegation, Plaintiffs refer to AIR in only 14 of the SAC's 750-plus paragraphs. (*See* Background, § II.) Those few factual allegations do not present circumstantial evidence of AIR's agreement to the alleged conspiracy. Plaintiffs do not adequately allege that AIR engaged in parallel conduct or identify any "plus factors" suggesting that AIR's alleged conduct—limited use of RealPage's RMS—was part of the alleged conspiracy.

### A.     Plaintiffs Do Not Plausibly Allege that AIR Engaged in Parallel Conduct

The Court's order denying Defendants' joint motion to dismiss addressed two categories of alleged parallel conduct: increases in rental prices and shifting to a pricing strategy that

prioritizes higher rents over vacancy concerns (i.e., "price over occupancy"). (Mem. Op. 22.) Neither category provides a factual foundation for conspiracy claims against AIR.

The Court already has concluded that Plaintiffs' allegations of purported parallel price increases do not raise an inference of <u>any</u> alleged price-fixing conspiracy. (Mem. Op. 28−29.) Accordingly, those allegations also fail to support conspiracy claims against AIR.

Plaintiffs likewise have not adequately alleged that AIR engaged in parallel conduct by adopting a price-over-occupancy strategy. The SAC contains <u>no allegations</u> suggesting that <u>AIR</u> engaged in any conduct, or made any statements, reflecting this strategic shift. (*See, e.g.*, Mem. Op. 25.) Nor do Plaintiffs' regression analyses fill this void.[3] (*See* SAC ¶¶ 351−65; Mem. Op. 26−27.) Those analyses apply to the entire regional market, sweeping in all market participants irrespective of their use of RealPage's RMS or whether they actually changed their pricing strategy in any way. Such analyses do little, if anything, to suggest that individual market participants, including RealPage customers, engaged in any shift in pricing strategy.

Plaintiffs' allegations are a far cry from the type of "particularized facts" required to plausibly suggest that AIR "undertook certain acts[] or engaged in certain conduct" indicating its agreement to any alleged conspiracy. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 721 (E.D. Pa. 2011). Absent any specific allegations pertaining to AIR, Plaintiffs' allegations of purported parallel conduct cannot be attributed to AIR.

**B.     The SAC's Allegations of "Plus Factors" Do Not Raise Plausible Grounds for Inferring that AIR Joined the Alleged Conspiracy**

Even if Plaintiffs alleged that AIR engaged in parallel conduct (they do not), the SAC still fails to state a plausible claim against AIR. Plaintiffs attempt to buttress their claims with

---

[3] Plaintiffs allege that AIR operates in only one of the four markets (Atlanta) for which they offer regression analyses. (*Compare* SAC ¶ 67, *with id.* ¶ 352.)

various plus factors, but Plaintiffs fail to allege a single plus factor that raises a plausible inference of AIR's agreement to the alleged price-fixing scheme. *See Travel Agent,* 583 F.3d at 907 (identifying plus factors that, collectively, could raise plausible inference of conspiracy). The most important plus factor—action against self-interest—does not apply to AIR, and the remaining plus factors do not move the needle, even when considered collectively.[4]

***Action against self-interest.*** Plaintiffs concede AIR did not agree to share confidential information with its competitors, thus rendering what the Court identified as "most persuasive" plus factor evidence of a horizontal agreement inapplicable to AIR. (Mem. Op. 31.)

***Limited, Non-Uniform Use of RMS.*** The specific conduct that AIR allegedly engaged in—the limited and distinct use of RealPage's RMS—"could just as well be independent action." *Twombly*, 550 U.S. at 557. There is nothing unusual or anticompetitive about licensing a revenue management tool. This is particularly true given Plaintiffs' concessions regarding AIR's non-uniform use of the tool—AIR did not agree to provide its data to competitors in <u>any</u> form. AIR is now the sole Defendant remaining in this case who Plaintiffs have conceded does not share its information. Further, RealPage provided <u>recommendations</u> that AIR was free to reject, and some RealPage customers, like AIR, had "low acceptance" rates and did not use RealPage employed or trained Pricing Advisors (SAC ¶ 286). Plaintiffs' allegations about AIR's limited, non-uniform

---

[4] Courts place little weight on vaguely alleged plus factors that logically apply to all market participants, like motive to conspire, attendance at industry events, or market structure. *See Hobart-Mayfield*, 48 F.4th at 668 (finding that inferences of conspiracy from "incentives to collude" and market structure were "conjecture" and "without support"). Such plus factors carry the same ambiguities as parallel conduct and do little, if anything, to distinguish unilateral from concerted action. *See id.* ("Being ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion."); *Travel Agent*, 583 F.3d at 910–11 (attending trade events with competitors are "more likely explained by [entities'] lawful, free-market behavior"). To find that such factors, even collectively, are enough to state a plausible conspiracy claim would all but nullify *Twombly*'s plausibility standard.

9

use of RMS do not, and cannot, raise a plausible inference that AIR agreed to the alleged conspiracy; instead, it is the type of conduct consistent with independent action. (*Cf.* Mem. Op. 32.) *See Processed Egg Prods.*, 821 F. Supp. 2d at 737−39 (participation in export program did not raise inference of illicit agreement to reduce egg supply where complaint "[did] not plausibly suggest that *all* exports" under program were part of alleged conspiracy (emphasis by court)).

*Attendance at trade association events.* Plaintiffs' vague allegation that AIR attended unspecified industry events cannot save Plaintiffs' conspiracy claim. (SAC ¶ 386.) Plaintiffs allege nothing more than passive attendance at unspecified events, which is "presumed legitimate and is not a basis from which to infer a conspiracy, without more." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007); *see also Travel Agent*, 583 F.2d at 910−11 (affirming dismissal of conspiracy claims because "[t]he fact that [Defendants] gathered at industry trade association meetings during the seven-year period when [they engaged in parallel conduct] should not weigh heavily in favor of suspecting collusion"); *Processed Egg Prods.*, 821 F. Supp. 2d at 723 ("[A]ctive participation, rather than merely passive presence [at industry events], [is] key in inferring agreement to the conspiracy.").

*Motive to conspire and market characteristics.* Courts routinely recognize that general allegations about a market are at best neutral and offer little, if any, insight into to whether alleged conduct was the product of unilateral or concerted decision-making. *See, e.g.*, *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (recognizing that "descriptions of the market" are "not allegations of anything that the defendants did" and "do not give rise to an inference of an unlawful agreement"). (*See also* n.6, *supra*.) The same is true here.

## CONCLUSION

The SAC does not raise a plausible inference that AIR joined the alleged conspiracy, and all claims against AIR should be dismissed.

10

Dated: January 8, 2024                    Respectfully submitted,


                                          */s/ Kathryn A. Reilly*
                                          Kathryn A. Reilly
                                          Michael T. Williams
                                          Judith P. Youngman
                                          Wheeler Trigg O'Donnell LLP
                                          370 Seventeenth Street, Suite 4500
                                          Denver, CO 80202
                                          Telephone: 303.244.1800
                                          Facsimile: 303.244.1879
                                          Email: reilly@wtotrial.com
                                                 williams@wtotrial.com
                                                 youngman@wtotrial.com

                                          And

                                          Mark Bell
                                          Holland & Knight LLP
                                          511 Union Street, Suite 2700
                                          Nashville, Tennessee 37219
                                          Telephone: 615.244.6380
                                          Email: mark.bell@hklaw.com

                                          Attorneys for Apartment Income REIT Corp.
                                          d/b/a AIR Communities

11

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on January 8, 2024, I electronically filed the foregoing **DEFENDANT APARTMENT INCOME REIT CORP.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS RENEWED MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record:

*s/ Claudia L. Jones for Kathryn A. Reilly*